# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| E.T., an individual,<br><br>          **Plaintiff,**<br><br>    **v.**<br><br>**ARPITA LLC d/b/a GERMAN VILLAGE INN;**<br><br>**HOMESTEAD MOTEL EAST;**<br><br>**RAJ HOSPITALITY LLC d/b/a SOUTHWIND HOTEL**<br><br>        **Defendants.** | **Case No.** _____<br><br>**JUDGE** _____<br>Related Case No.: 19-cv-849<br><br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

COMES NOW, the Plaintiff E.T. ("Plaintiff" or "E.T."), by and through her undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## <u>INTRODUCTION</u>

1. For decades, sex trafficking operations have taken place openly in hotels and motels across the United States.

2. For decades, the hotel industry has publicly acknowledged the issue of human trafficking on both brand and independently owned properties. Yet, where such crimes are most widespread, these properties ultimately profited and continue to profit from activities occurring at these locations. Human trafficking remains a persistent problem within the hotel and hospitality industry.

3. While major hotel brands issue misleading public statements to protect their reputations, many independently owned and operated hotels and motels deny any knowledge of

human trafficking on their premises. Some are actively involved facilitating trafficking, protecting traffickers, and turning a blind eye as countless victims are beaten, abused and raped everyday on their property.

4.      The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S. Code § 1595, gives survivors like E.T., an ability to hold those responsible for her trafficking accountable and for civil recourse against those whom "knowingly benefit, or attempt, or conspire to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in [recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, or soliciting a person that will be caused to engage in commercial sex by use of force, fraud or coercion; or forcing a person to engage in commercial sex by use of force, fraud or coercion]…."

5.      Plaintiff is a survivor of human sex trafficking.

6.      E.T.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

7.      E.T. was put into sex trafficking by her mother when she was just 16-years -old. For the nearly two decades, E.T. was sold to various men who trafficked her for sex. Ultimately, her traffickers came to control every aspect of her life. The defining factor of the relationship between E.T. and her traffickers, was that each night, E.T.'s traffickers forced her to have sex with men for money.

8.      E.T. was trafficked in hotels owned by Defendants Arpita LLC d/b/a German Village Inn, Homestead Motel East, and Raj Hospitality LLC d/b/a Southwind Hotel.[1] E.T.'s traffickers rented hotel rooms for one purpose—a location to engage in sex trafficking.

---

[1] Properties Arpita LLC d/b/a German Village Inn, Homestead Motel East, and Raj Hospitality LLC d/b/a Southwind Hotel, will hereinafter be referred to collectively as "Defendants."

9.      At Defendants' hotels and motels, E.T. was forced to engage in sex with many men every day. Every new customer was another instance E.T. was forced to have sex against her will—that is to say, E.T. was raped multiple times per day by multiple men when she stayed at Defendants' hotels.

10.     E.T.'s traffickers forced her onto Defendants' properties where she was repeatedly raped and forced to perform commercial sex acts with "buyers" under threats of physical and psychological abuse.

11.     At some point, E.T. was able to escape the grasps of her traffickers and the prison of the Defendants' hotel and motel rooms.

12.     E.T. has spent a considerable amount of time attempting to regain the life that was stripped away from her as a result of her trafficking.

13.     E.T. files this lawsuit seeking civil recourse and justice for the harm she suffered as a result of the heinous acts committed against her while she was being sold for sex at the hotels owned, operated, managed, supervised, and/or controlled by Defendants and their agents and employees, whom all knew or should have known what was occurring on the properties.

## **PARTIES**

14.     Plaintiff E.T. is a natural person and a resident and citizen of Columbus, Ohio.

15.     E.T. is a victim of human trafficking pursuant to 22 U.S.C. § 7102(17) and (18) U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 11 U.S.C. § 7102(16).

    a.  Due to the sensitive and intimate nature of the issues, E.T. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the

confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after. [2]

b. Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and personal nature. [4] For good cause, the Court may issue an order to protect a part or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. E.T. fears the stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d. E.T. should not be compelled to disclose her identity in order to maintain her privacy and safety. E.T.'s privacy interest substantially outweighs the customary practice of judicial openness.[6]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

e. Moreover, Defendants will not be prejudiced. E.T. will agree to reveal her identity to Defendants for the limited purpose of investigating E.T.'s claims once the parties have entered into a protective order. E.T. simply seeks redaction of E.T.'s personal identifying information from the public docket and assurances that Defendants will not use or publish E.T.'s identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

16. **Defendant Arpita LLC ("Arpita") d/b/a German Village Inn** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its owner/registered agent, Bhikha Patel, located at 4771 Nicholas Point Drive, Grove City, OH 43213.

17. Defendant Arpita owned, operated and supervised the German Village Inn located at 920 S. High Street, Columbus, OH 43206, from during or about January 2004 through August 2018.

18. Defendant benefited from its operations at the German Village Inn through room revenue.

19. Whenever reference is made in this Complaint to any act, deed, or conduct of Arpita, the allegation is that Arpita engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of German Village Inn, where E.T. was trafficked.

20. **Defendant Homestead Motel East ("Homestead")** is a privately owned company organized under the laws of and operating within the State of Ohio. It can be served by its owner,

Bhikha Patel, located at 4771 Nicholas Point Drive, Grove City, OH 43213.

21. Defendant owned, operated and supervised the Homestead Motel East located at 4182 E. Main Street, Columbus, OH 43213, about or during November 1998 to present.

22. Defendant benefited from its operations at the Homestead Motel East in more ways than just through room revenue. Upon information and belief, Defendant gathered personal data from the Wi-Fi services it provided to guests, including both E.T. and her traffickers. This data collection provided further value to Defendant enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

23. Whenever reference is made in this Complaint to any act, deed, or conduct of Defendant, the allegation is that Defendant engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Homestead Motel East, where E.T. was trafficked.

24. **Defendant Raj Hospitality LLC ("Raj Hospitality") d/b/a Southwind Motel** is a limited liability company organized under the laws of and operating within the State of Ohio. It can be served by its owner, William Klausman Esq., located at 75 E. Gay Street, Suite 300, Columbus, OH 43215.

25. Defendant Raj Hospitality owned, operated and supervised the Southwind Motel located at 919 S. High Street, Columbus, OH 43206 from during or about October 2004 through March 2021.

26. Raj Hospitality benefited from its operations at the Southwind Motel in more ways than just through room revenue. Upon information and belief, Raj Hospitality gathered personal data from the Wi-Fi services it provided to guests, including both E.T. and her traffickers. This

data collection provided further value to Raj Hospitality, enhancing its ability to market and promote its services while maintaining and promoting a positive public image for its property.

27. Whenever reference is made in this Complaint to any act, deed, or conduct of Raj Hospitality, the allegation is that Raj Hospitality engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Southwind Motel, where E.T. was trafficked.

## JURISDICTION AND VENUE

28. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

29. The Court has personal jurisdiction pursuant to the TVPRA.

30. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendants have their principal places of business within this District.

31. Venue is proper in this District pursuant to Southern District of Ohio Local Rule 3.1(b), this case is related to the sex trafficking cases currently pending before Judge Algenon L. Marbley.

## OVERVIEW OF TRAFFICKING

32. For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Traffickers paraded throughout hotels, while hospitality giants stood on the sidelines and did nothing. Instead, hotels and motels paid only lip service to campaigns against sex trafficking and stood by collecting millions in profits from their trafficking occurring on their properties.

33. The relationship between a pimp and a prostitute is inherently coercive, and the

United States Department of Justice and other agencies and organizations have recognized that most individuals involved in so-called prostitution are subject to force, fraud, or coercion.[7] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

34.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[8]

35.     Defendants knew and have known for decades that they profit from sex trafficking repeatedly occurring under their individually owned properties. Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants chose to ignore the open and obvious presence of sex trafficking on their individually owned properties, benefitting from the profit and fees created by rooms rented and Wi-Fi provided for this explicit and apparent purpose.

36.     The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[9] However, traffickers aren't the only profiteers. The hotel industry, including Defendants, makes millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night and

---

[7] See, e.g., A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report, https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; Prostitution and Trafficking in Women: An Intimate Relationship, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women intimate-relationship.
[8] Id.
[9] Profits and Poverty: The Economics of Forced Labor, INTERNATIONAL LABOR ORGANIZATION (2017), https://www.ilo.org/global/topics/forced-labour/statistics/lang--en/index.htm.

providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

37.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what Defendants knew or should have known regarding the trafficking of E.T. at Defendants' Hotels and Motels.

38.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[10] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[11] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[12] Hotels have been found to account for over 90 percent of commercial exploitation of children.[13]

39.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the defendants, on best practices for identifying and responding to sex trafficking.[14]

---

[10] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-traffickingusslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere."

[11] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[12] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wpcontent/ uploads/2019/05/Adoptingthecode.report.cornell.pdf

[13] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[14] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, Red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf; Texas Attorney General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf .

40.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and End Child Prostitution, Child Pornography, and the Trafficking of Children for Sexual Purposes ("ECPAT"), among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[15]

41.     Widely recognized signs of sex trafficking, which can be observed by hotel staff all which Defendants' properties were made of aware of, include but are not limited to:

    a.  Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

    b.  Individuals show signs of physical abuse, restraint, and/or confinement;

    c.  Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

    d.  Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

    e.  Individuals lack freedom of movement or are constantly monitored;

    f.  Individuals avoid eye contact and interaction with others;

    g.  Individuals have no control or possession of money or ID;

    h.  Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

---

[15] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, Red Flags for Hotel & Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, Human Trafficking Red Flags, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).

     i.   Individuals have few or no personal items – such as no luggage or other bags;

     j.   Individuals appear to be with significantly older "boyfriend" or in the company of older males;

     k.   A group of girls appear to be traveling with an older female or male;

     l.   A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

     m.   Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

     n.   Possession of bulk sexual paraphernalia such as condoms or lubricant;

     o.   Possession or use of multiple cell phones; and

     p.   Possession or usage of large amounts of cash or pre-paid cards.[16]

42.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff. Tool kits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[17] From check-in to check-out, there are indicators that traffickers and their victims exhibit during their stay at the hotel.

43.     The hospitality industry, speaking through industry organizations, has in recent years been increasingly vocal about its supposed "unified commitment" to combat human trafficking. Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to the very opposite: continuing with business as usual, so that Defendants and all industry participants

---

[16] *Id.*

[17] Department of Homeland Security, Blue Campaign Toolkit, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

continue to profit thousands from participating in a venture in violation of § 1591(a).

44.     Defendants' decision to prioritize profits over protecting sex trafficking victims resulted in the repeated sexual exploitation and rape of Plaintiff E.T. on their properties.

45.     E.T. is a survivor of sex trafficking. Key findings from the Polaris Project are that "[s]urvivors of human trafficking are not thriving. The systems that were supposed to protect them before, during and after their human trafficking situations failed and failed miserably. Systems such as child welfare, criminal justice and legal systems failed." https://polarisproject.org/national-survivor-study/

46.     E.T. looks to the judicial system, who has been empowered by Congress to provide a remedy to Victim-Survivors pursuant to the TVPRA, 18 U.S.C. § 1595 and 18 U.S.C. § 2255. Defendants knowingly benefitted from participation in a venture that it knew or should have known to be engaging in violations of 18 U.S.C. § 1595(a).

## FACTUAL BACKRGOUND

### INTRODUCTION

47.     E.T. brings her claims against multiple hotel locations for violations of the TVPRA.

48.     The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1595(a) and thereby establishes a non-delegable duty of reasonable care.

49.     An overwhelming majority of commercial sex trafficking transactions occur within the hotels and motels, as traffickers use their rooms as the hub for their operations.[18] Hotels offer anonymity and non-traceability, privacy, and discretion, making them ideal venues sex trafficking. Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the

---

[18] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_ 7840754.

hotel solely to purchase sex. In addition, traffickers regularly use Defendants' Wi-Fi to advertise and solicit victims for commercial sex against their will.

50.     As part of their conspiracy, to save costs and continually reap profits, Defendants generally failed to create, adopt, implement, and enforce company-wide policies and procedures regarding suspected incidents of human trafficking at the wholly and independently owned properties—despite the general knowledge in the industry and their own records that human sex trafficking was happening in the hotel industry and in their wholly and independently owned properties. Furthermore, Defendants did not train staff on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

51.     Upon information and belief, Defendants kept no reports or data on suspected incidences or occurrences of human trafficking on their properties and the rate at which those occurrences decreased as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

52.     Upon information and belief, Defendants did nothing in the face of the human sex trafficking epidemic in their industry.  Instead, they continued to profit from the rental of rooms that they knew or should have known were rented and used for the purpose of sex trafficking.

53.     Upon information and belief, Defendants thus failed to act to ensure that it did not benefit from the human sex trafficking occurring at its wholly and independently owned properties. Defendants failed to implement appropriate policies and procedures that a reasonably diligent business would or should have implemented so that it would not continue to benefit from the human trafficking occurring at their wholly and independently owned properties.

54.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a

location to force victims like E.T. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' wholly and independently owned properties while Defendants reap the benefits.

55.     Plaintiff E.T.'s injuries are indivisible and cannot be separated. E.T.'s injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

56.     E.T.'s injuries are almost exclusively mental, emotional, and psychological in nature and derive from the trafficking period. The trafficking period is ongoing and continuous and resulting injuries cannot be divided; thereby subjecting Defendants to joint and several liability. Federal common law provides for joint and several liability for indivisible injuries, such as those suffered by E.T.

57.     Plaintiff's injuries, particularly E.T.'s ongoing mental, emotional, and psychological injuries, have no reasonable basis on which to determine the relative contribution of a particular defendant's conduct to the single harm.

58.     Violators of Section 1595 of the TVPRA are jointly and severally liable for a victim's damages. Victims are entitled to all compensatory and non-compensatory damages incurred during their trafficking period. 18 U.S.C. § 1595(a). Thus, Defendants are jointly and severally liable for E.T.'s damages in this case.

**THE SEX TRAFFICKING OF PLAINTIFF E.T.**

59.     E.T. was placed into sex trafficking by her mother at sixteen (16) years old. For the next two decades, E.T. was sold between numerous traffickers.

60.     By means of a combination of force, coercion, violence, threats, manipulation, compelled use of and dependency on illegal substances, control over identification documents and possessions, and deprivation of basic survival necessities such as, but not limited to, food, water,

transportation, shelter, and clothing, E.T. was held captive and sold for sex by her traffickers.

61.     During the time that she was trafficked, E.T.'s traffickers frequently rented rooms at the Defendants' hotel and motel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns" that would pay to engage in sex with E.T.

62.     Throughout her trafficking, E.T.'s traffickers connected with "johns" by posting or causing to be posted advertisements on Backpage, advertising for E.T.'s availability for commercial sex. E.T.'s traffickers posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

63.     E.T. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels and motels.

64.     From approximately 2004 through 2019, while under the coercive control of her trafficker, E.T. was imprisoned in hotels rooms rented by her trafficker and forced to have sex for money.

65.     While at Defendants' wholly and independently owned properties, E.T.'s trafficker violently attacked and beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. Her deterioration and poor health conditions were obvious to anyone who saw her.

66.     During her captivity at Defendants' wholly and independently owned properties, E.T. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned.

67.     At the above-listed hotels, E.T. encountered the same staff on multiple occasions. Defendants staff would have seen the signs of E.T.'s deterioration brought on by the abuse perpetrated by her traffickers, including bruising and physical and verbal abuse occurring in public

areas of Defendants' properties as well as signs of malnutrition and poor health.

68.     Every time E.T. interacted with the Defendants' staff, it was readily apparent that E.T. was under the control of her traffickers. E.T.'s traffickers checked in to Defendants' hotels using E.T.'s name or their name.

69.     E.T.'s traffickers followed a repetitive and routine procedure during stays at the Defendants' wholly and independently owned properties, and Defendants knew or should have known of E.T.'s trafficking because of a variety of factors detailed below.

70.     Plaintiff was trafficked for sex at the German Village Inn located at 920 S. High Street, Columbus, OH 43206, regularly from about 2005 through May 2017.

71.     Plaintiff was trafficked for sex at the Homestead Motel East located at 4182 E. Main Street, Columbus, OH 43213, regularly during September 2017.

72.     Plaintiff was trafficked for sex at the Southwind Hotel located at 919 S. High Street, Columbus, OH 43206, from about 2016 through 2019.

73.     For approximately fifteen years, E.T.'s traffickers rotated between hotels and chose the Defendants' locations as their most frequented due to their relationships between traffickers and the hotel employees that allowed the traffickers free reign to conduct their illegal trafficking business.

74.     Due to the relationships between Defendants' employees and E.T.'s traffickers, E.T. understood that the Defendants' hotels and motels staff, employees, and owners would not help her and that she would likely be beaten or killed if she sought help from them.

75.     During this time, E.T. was under the control of her traffickers and endured many beatings, threats and psychological manipulation. E.T. would frequently have visible bruises and injuries.

76.     Staff at the Defendants' hotels and motels saw and heard the fights occurring on their properties, including but not limited to involving E.T. and her traffickers, but did not call the police or intervene in anyway to help.

77.     Plaintiff's traffickers often had multiple girls at the hotels. There was constant, ongoing foot traffic going in and out of the rooms rented by E.T.'s traffickers.

78.     During the time E.T.'s traffickers held her captive at the Defendants' hotels and motels, Plaintiff's traffickers or Plaintiff herself would ask for excessive amounts of linens and towels throughout their stays as a direct result of the trafficking.

79.     E.T. consistently witnessed clear signs of others being sex trafficked at the same times she was trafficked at the Defendants' hotels and motels, meaning it should have been easily detectible upon reasonable inspection.

80.     It became clear to E.T. during the time of her trafficking that her traffickers' and the Defendants' sex trafficking operation was a routine business operation and the hotels and motels were welcoming and participating in.

**THE SEX TRAFFICKING OF E.T. AT GERMAN VILLAGE INN**

81.     Plaintiff E.T. was subjected to sex trafficking at the independently owned German Village Inn located at 920 S. High Street, Columbus, OH 43206.

82.     E.T. and her traffickers stayed at the German Village Inn from about 2005 through May 2017, frequently staying for days at a time, encountering the same staff, within this period.

83.     Hotel staff at German Village Inn always placed E.T. and her traffickers in a room away from other guests. There were only male guests in and out of E.T. and her traffickers' room while multiple girls were kept in a room at once.

84.     On more than one occasion, E.T.'s traffickers physically abused her at the German

Village Inn.

85.    E.T.'s pain and suffering at the German Village Inn was ongoing, as loud sounds of abuse and E.T.'s screams for help could often be heard from the room.

86.    Further, E.T.'s stays at the German Village Inn resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms;  and loitering or soliciting on hotel grounds.

87.    E.T. was repeatedly raped and otherwise sexually abused many times at the German Village Inn.

88.    Based on information and belief, before and at the time E.T. was trafficked at the German Village Inn, staff saw E.T. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of E.T., described above.

89.    Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and

out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

90.     Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

91.     Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about German Village Inn that directly put Defendant on notice of red flags of sex trafficking, including from 2005 to May 2017. Reviews specifically mention prostitution on the property, hookers, extensive drug use and drug dealers, sketchy clientele, and condoms in the rooms.

92.     As such, Defendant knew and should have known that E.T. was being trafficked at the German Village Inn.

93.     At all times relevant, from 2005 through May 2017, Defendant  profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with E.T.'s traffickers for her sex trafficking.

**THE SEX TRAFFICKING OF E.T. AT THE HOMESTEAD MOTEL EAST**

94.     Plaintiff E.T. was subjected to sex trafficking at the independently owned Homestead Motel East located at 4182 E. Main Street, Columbus, OH 43213.

95.     E.T. and her traffickers stayed at the Homestead Motel East during or about

September 2019, frequently staying for days at a time, encountering the same staff, within this period.

96.    Hotel staff at Homestead Motel East always placed E.T. and her traffickers in a room away from other guests. There were only male guests in and out of E.T. and her traffickers' room while multiple girls were kept in a room at once.

97.    On more than one occasion, E.T.'s traffickers physically abused her at the Defendant's property.

98.    E.T.'s pain and suffering at the Homestead Motel East was ongoing, as loud sounds of abuse and E.T.'s screams for help could often be heard from the room.

99.    Further, E.T.'s stays at the Homestead Motel East resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel grounds.

100.    E.T. was repeatedly raped and otherwise sexually abused many times at the Homestead Motel East.

101.    Based on information and belief, before and at the time E.T. was trafficked at the Defendant's property, staff saw E.T. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of E.T., described above.

102.    Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for prolonged stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

103.    Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

104.    Based upon information and belief, Defendant read all online reviews about their property. Numerous reviews were left online about Homestead Motel East that directly put Defendant on notice of red flags of sex trafficking, including September 2019. Reviews specifically mention the property being dangerous, heavy police presence, and a manager making sexual advances towards guests.

105.    As such, Defendant knew and should have known that E.T. was being trafficked at the Homestead Motel East.

106.    At all times relevant, during September 2019, Defendant, Homestead Motel East,

profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with E.T.'s traffickers for her sex trafficking.

## THE SEX TRAFFICKING OF E.T. AT THE SOUTHWIND HOTEL

107.    Plaintiff E.T. was subjected to sex trafficking at the independently owned Southwind Hotel located at 919 S. High Street, Columbus, OH 43206.

108.    E.T. and her traffickers stayed at the Southwind Hotel from during 2016 through 2019, frequently staying for days at a time, encountering the same staff, within this period.

109.    Hotel staff at Southwind Hotel always placed E.T. and her traffickers in a room away from other guests. There were only male guests in and out of E.T. and her traffickers' room while multiple girls were kept in a room at once.

110.    On more than one occasion, E.T.'s traffickers physically abused her at the Defendant's property.

111.    E.T.'s pain and suffering at the Southwind Hotel was ongoing, as loud sounds of abuse and E.T.'s screams for help could often be heard from the room.

112.    Further, E.T.'s stays at the Southwind Hotel resulted in several consistent red flags, including, but not limited to: paying for stays in cash; paying for extended stays on a day-by-day basis; requesting a room away from other guests; obvious signs of illegal drug use; frequent requests for linen changes; unusually large number of used condoms in the trash; physical abuse in public spaces; visible signs of prior and private physical abuse; unusually large number of male visitors coming in and out of the room; asking the front desk not to be disturbed; women wearing clothing inappropriate for the weather; loud noises of abuse or other emergency audible to staff or other rooms; and loitering or soliciting on hotel property.

113.    Based on information and belief, before and at the time E.T. was trafficked at the Southwind Hotel, staff saw E.T. being held captive, controlled, drugged, abused, hit, and trafficked for sex there. Defendant and their employees directly witnessed all signs of sex trafficking, including the trafficking of E.T., described above.

114.    Defendant knew or should have known staff at its property was participating in and facilitating sex trafficking and that it was generating revenue through policies that encouraged sex traffickers to operate at their property, including but not limited to not implementing policies and procedures known to be necessary to stop known trafficking; allowing daily payments of cash for extended stays; complying with requests for rooms to be rented away from other guests; allowing traffickers to escort bruised and battered women to rooms; allowing many "johns" to come in and out of the rooms where victims were trafficked in; allowing guests to use illicit drugs on property; allowing guests to carry weapons on the property; ignoring large amounts of sex paraphernalia; not addressing trafficking signs and reports of drugs, abuse, and prostitution; forming relationships with traffickers and treating traffickers with benefits by accommodating specific requests that entail known signs of trafficking and not reporting the trafficking to authorities or taking any steps to prevent it at their properties.

115.    E.T. was repeatedly raped and otherwise sexually abused many times at the Southwind Hotel.

116.    Defendant has direct access to reviews left by guests on websites wherein guests frequently complain about the prevalence of obvious trafficking, hearing physical violence by traffickers, and other signs of trafficking.

117.    As such, Defendant knew and should have known that E.T. was being trafficked at the Southwind Hotel.

118.    At all times relevant, from 2016 through 2019, Defendant, Raj Hospitality, profited and directly benefited from the room rentals and other good and things purchased as a direct result of their participation in the sex trafficking venture with E.T.'s traffickers for her sex trafficking.

## DEFENDANTS ARE JOINTLY AND SEVERALLY LIABLE FOR E.T.'S DAMAGES

119.    The venture or ventures in which each Defendant participated were direct, producing and proximate causes of the injuries and damages to E.T.

120.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to E.T. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

## CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA") (AGAINST ALL DEFENDANTS)

121.    Plaintiff incorporates each foregoing allegation in paragraphs 1 through 120.

122.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

123.    Defendants acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of E.T. and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

124.    Defendants have continued to benefit as a result of these acts, omissions, and/or commissions by renting rooms and providing Wi-Fi to traffickers and customers, keeping

operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion, they received payment for rooms or kickbacks from internet usage, contributing to their direct financial benefit from the sex trafficking of E.T. when they knew or should have known that violations of §1595(a) were occurring.

125.    Despite Defendants' knowledge of E.T.'s sex trafficking, E.T.'s traffickers were able to continue renting rooms for the sexual exploitation of E.T.

126.    Defendants participated in a venture together and with, among others, E.T.'s traffickers. Defendants had an ongoing business relationship and association in fact with E.T.'s traffickers. Despite knowing or having reason to know that E.T. was being sex trafficked in violation of the TVPRA, Defendants continued to rent rooms to her traffickers, providing a secure venue for E.T.'s sexual exploitation. E.T.'s sex traffickers used Defendants' Hotels and Motels because they knew that staff members looked the other way despite obvious signs of trafficking. Each of the venturers shared a common purpose – the rental of hotel rooms and the making of profits. Defendants profited while E.T.'s traffickers were able to rent a secure venue to earn profits by trafficking E.T. Defendants participated in the venture by continually renting rooms to E.T.'s traffickers, failing to properly implement anti-trafficking rules and policies, and assisting traffickers to continue their sexual exploitation with minimal risk of detection and disturbance, all the while ignoring the obvious signs of E.T.'s trafficking.

127.    Defendants' failure to train and supervise their agents and employees, as well as their disregard for the welfare of their guests, including E.T., enabled and contributed to her sex trafficking.

128.    The facts alleged establish that Defendants knowingly benefited, financially or by

receiving anything of value, from participating in a venture that Defendants knew or should have known has engaged in an act in violation of the TVPRA.

129.     Plaintiff E.T. has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and motels. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages, therefore Defendants are jointly and severally liable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.     Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.     Disgorgement of profits obtained through unjust enrichment;

c.     Restitution;

d.     Statutory and/or treble damages, where available;

e.     Punitive damages;

f.     Attorneys' fees and expenses;

g.     The costs of this action;

h.     Pre- and post-judgment interest; and

i.     Any other relief the Court or jury deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by a struck jury.

Dated: June 23, 2025

Respectfully submitted,

*/s/ Jeremy W. Hoshor-Johnson*
Jeremy W. Hoshor-Johnson (0075502)
Penny L. Barrick (0074110)
Steven C. Babin, Jr. (0093584)
Babin Law, LLC
10 West Broad Street, Suite 900
Columbus, Ohio 43215
T: 614-761-8800
E: Steven.babin@babinlaws.com /
Jeremy.hoshorjohnson@babinlaws.com /
Penny.barrick@babinlaws.com